**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **INFORMATION INTERNATIONAL ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | **NO. 04-1489C** |
| **V.** | ) | **(Judge Braden)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD AND PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION OR IN THE ALTERNATIVE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Information International Associates, Inc., and files this, its Motion For Judgment On The Record or in the Alternative, Plaintiff's Motion For Summary Judgment, and Brief in Support of its Motion, and states as follows:

The parties have agreed that there is one issue to be determined by this Court; i.e.: In her review of Plaintiff's Best And Final Offer on the subject procurement, did the contracting officer know, or should she have known, that the Plaintiff's bid contained a mistake in bid and should she have requested verification of Plaintiff's bid to alert it of that mistake? Plaintiff avers that the contracting officer failed in her duty under Federal Acquisition Regulation *§14.407.1* to properly review Plaintiff's Best And Final Offer for a mistake in bid. Plaintiff contends that upon a proper review the mistake in bid would have been obvious and required the contracting officer to request a verification in bid from the Plaintiff. Failing in her duty, this gives rise to liability on the part of the Defendant to the Plaintiff for costs incurred as a result of the mistake in bid.

Plaintiff also contends that it is entitled to a verdict as a matter of law pursuant to Rule 56(c), as there is no genuine matter of material fact to be tried and a verdict can be determined from the record presented to this Court.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

(It is noted that counsel have agreed that the original depositions filed with the Court will be designated as Joint Exhibits as follows:

Joint Exhibit #1: Deposition of Rosalind Baker

Joint Exhibit #2: Deposition of Patricia Powell

Joint Exhibit #3: Deposition of Bruce Bowland

Joint Exhibit #4: Deposition of Mary Wood

All references to these Joint Exhibits in Plaintiff's Brief shall be designated as "JE" and the number.)

## FINDINGS OF FACT

1. The Defendant issued Solicitation No. F05603-98-R0002 on or about August 7, 1998.

2. The solicitation called for proposals to furnish labor and supplies to man and manage libraries at five (5) identified Air Force Bases, one of which was Malmstrom Air Force Base.

3. The solicitation called for a two part proposal. Part "A" was the offerors' Technical Proposal and Part "B" was the offerors' cost proposal.

4. The cost proposal was to be provided utilizing formats provided by the Defendant. Each of the five Air Force Bases was to be bid separately although the

award was to be made on all of the Air Force Bases as a whole. (JE #1, Baker Depo., p. 17, ll, 17-25; p. 18, ll. 1-14; Plaintiff's Exhibit #1)

5. The bid sheets for each Air Force Base called for a Base bid for the first year and four (4) option years. It also contained a set price for furnishing materials and supplies which was furnished by the Defendant. (JE#1, Baker Depo., p. 17, ll. 18-23; p. 19, ll. 6-25; Plaintiff's Exhibit #1, pp. 008-0019: For example, please refer to Line Items 0002AA and 0002AB on p. 0008)

6. The largest portion of the price proposals was composed of the labor costs for the personnel assigned to staff the libraries, comprising approximately Eighty Percent (80%) of the total bid for each Base. (Plaintiff's Exhibit #1, pp. 008-0019)

7. Plaintiff prepared and submitted a proposal in response to the Defendant's solicitation. The cost portion of Plaintiff's proposal was prepared by Patricia Powell, Plaintiff's Director of Finance and Administration. (Exhibit JE#2, Powell Depo., p. 18, ll. 23-25)

8. Mrs. Powell testified that she did all of the staffing for this effort including the number of staff at each location, type of staff and working hours. (JE#2, Powell Depo., p. 19, ll. 1-19)

9. Mrs. Powell wrote the entire technical proposal and oversaw the oral presentation. (JE#2, Powell Depo., p. 20, ll. 4-6)

10. Mary Woods and Jim Covey assisted Mrs. Powell in the development of the original spreadsheets and the actual price proposal. (JE#2, Powell Depo., p. 20, ll. 8-11)

11. Mrs. Powell was the source for the salaries, overhead and G&A. (JE#2, Powell Depo., p. 20, ll. 22-24)

12. Mrs. Powell testified that she determined how the bases would be staffed by starting with the Statement of Work (SOW) that was provided by the Defendant. She identified all of the activities required to fulfill the SOW and did a systematic review of what types of people it would take. She then projected the necessary hours to do the job. (JE#2, Powell Depo., p. 22, ll. 13-20)

13. Mrs. Powell also testified that she was the one who reviewed the original proposal for completeness and accuracy. (JE#2, Powell Depo., p. 24, ll. 10-14)

14. Mrs. Powell did not go through the spreadsheets and recalculate the numbers because that was the job of the accounting staff. She did some double checking and simply checked the bottom line on the spreadsheets. (JE#2, Powell Depo., p. 25, ll. 4-19; p. 26, ll. 1-21)

15. The Defendant's contracting officer, Rosalind Baker, gathered a technical panel to evaluate the Technical Proposals. (JE#1, Baker Depo., p. 20, ll. 19-21) However, the Price Proposals were evaluated only by the contracting officer, Rosalind Baker. (JE#1, Baker Depo., p. 14, ll 6-21)

16. The technical panel not only evaluated the offerors' written proposal but also conducted oral presentations. (JE#1, Baker Depo., p. 21, ll 18-23) The technical panel was to determine who was technical acceptable. (JE#1, Baker Depo., p. 20, ll. 19-22)

17. After evaluations, the Plaintiff and one other offeror, Margon, were identified as being within the competitive range. (JE#1, Baker Depo., p. 21, ll. 14-15;

Plaintiff's Exhibit #2)

18. According to the contracting officer, she did not remember if she had conducted discussions with the offerors. (JE#1, p. 21, ll. 14-19)

19. The contracting officer directed the Plaintiff and the other offeror to present Best And Final Offers. (Plaintiff's Exhibit #3)

20. The contracting officer's notice to the two qualified offerors contained a direction that required the offerors to maintain the same staffing numbers that they had proposed in their initial proposal. The letter stated: "offerors are advised not to modify what was presented in their oral proposals in their final price proposal either directly, by inference, or effect. Example: manning levels and employee classifications should not be modified in order to reduce price at time of final proposal." (Plaintiff's Exhibit #3)

21. Ms. Baker testified that, in her opinion, this language was just an advisement and for the offerors to proceed at their own risk. (JE#1, Baker Depo., pp. 22-23)

22. When asked if the technical panel had determined that the Plaintiff's proposal had been acceptable from a manning level as to how many personnel were acceptable for each library, Ms. Baker replied that she could not recall. (JE#1, Baker Depo., 23, ll. 4-13; p. 24, ll. 2-7)

23. The Request For Final Proposals also contained a copy of an SF1447 and a copy of Section B from the solicitation for the offerors to complete for their Final Price Proposal. (Plaintiff's Exhibit #3)

24. Ms. Baker did not recall if the technical panel had reviewed the manning levels and found them acceptable. (JE#1, Baker Depo., p. 23, ll. 4-13; p. 24, ll. 2-14)

25. By the time the Plaintiff had the request for the Best And Final Pricing, Jim Covey was the director of finance and was responsible for finalizing the proposal. (JE#2, Powell Depo., p. 31, ll. 3-8)

26. Mrs. Powell testified that she worked on the final bid by slightly changing some of the responsibilities so that they reduced some of the hours. She also testified that she did not combine two positions into one to reduce costs. (JE#2, Powell Depo., p. 32, ll. 6-25; p. 33, ll. 1-11)

27. According to Mrs. Powell, the procedure was not the same for the final bid because she now had an accounting department and they took care of the spreadsheets. (JE#2, Powell Depo., p. 35, ll. 1-8)

28. The data for the Best And Final Offer was entered onto spread sheets by Mr. Covey who then also entered it onto the Bid Sheets and reviewed the final numbers. (JE#2, Powell Depo., pp. 36-37)

29. Except for the initial two (2) months, the salary for the "Library Assistant/Computer Oper III" for Malmstrom Air Force Base was entered into the spread sheets as a "0." This resulted in a small value for the total for the first year for this position and a "0" for the totals for the remaining option years. (Plaintiff's Exhibit #5)

30. These incorrect figures were mistakenly entered onto the Bid Sheets for the Best And Final Offer. This resulted in a difference between the initial offer and the Best And Final Offers for Malmstrom Air Force Base as follows:

| | | Initial Proposal | | BAFO | |
|---|---|---|---|---|---|
| | | Monthly | Year | Monthly | Year |
| A. | Base Year: | $11,348 | $136,174 | 8,361 | 100,332 |
| B. | First Option Year: | 11,507 | 138,087 | 7,894 | 94,728 |
| C. | Second Option Year: | 11,727 | 140,724 | 7,854 | 94,248 |
| D. | Third Option Year: | 11,953 | 143,430 | 8,078 | 96,936 |
| E. | Fourth Option Year: | 12,385 | 148,617 | 8,253 | 99,036 |
| Five Year Total: | | 890,032.43 | | 668,280.00 | |

(*Plaintiff's Exhibit #1, pp. 0010, 0011 and Plaintiff's Exhibit #4, pp. 006, 007*)

31. Plaintiff's Best And Final Offer was reviewed solely by the contracting officer, Rosalind Baker. Ms. Baker testified that although each Base had to operate on its own, she was not interested in reviewing the cost proposals for the individual Air Force Bases and was only interested in the total price. (JE#1, Baker Depo., p. 25, ll. 6-18)

32. Ms. Baker testified that she did not compare the Final Cost Proposal with the Plaintiff's Initial Cost Proposal and would only have looked at the bottom line. (JE#1, p. 25, ll. 11-22; p. 26, ll. 1-16)

33. Ms Baker testified that the Two Hundred and Thirty Thousand, Two Hundred and Forty-Seven Dollar ($230,247) reduction in Plaintiff's bottom line price did not alert her because the contract was performance based and it was up to the contractor how they were going to man the bases. (JE#1, Baker Depo., p. 27, ll. 1-12)

34. Ms. Baker testified that although the contractor bid based on manning levels, (JE#1, Baker depo., p. 28, ll. 24 to p. 29, l. 12) she was not interested in

reviewing the cost proposals to determine if the offerors had changed their proposal. She was just looking at the bottom line price. ( JE#1, Baker Depo., p. 30, l. 22 to p. 31, l. 17)

35. Ms. Baker testified that she did not go through the proposals on a point-by-point basis to determine if the proposal had changed. (JE#1, Baker Depo., p. 33, l. 21 to p. 34, l. 4)

36. Ms. Baker did, however, create an "Abstract of Proposal/Quotations" that carried forward all of the line item figures contained in the Plaintiff's Best And Final cost proposal. (Plaintiff's Exhibit #6)

37. Ms. Baker also typed the letter to the losing bidder that contained all of the data concerning the individual line items from Plaintiff's Final Price Proposal. (Plaintiff's Exhibit #7)

38. Mary Woods was the first individual to discover the mistake in Plaintiff's cost proposal. She discovered it after the contract had been awarded and she was loading the data into her computer to set up salaries for the prospective employees. (JE#4, Woods Depo., p. 15, ll. 17-24; JE#2, Powell Depo. p. 40, ll. 5-24)

39. Mrs. Woods discovered that the salaries as reflected in the bid sheet did not appear correct because they went down after the first year, which is not characteristic. (JE#4, Woods Depo., p. 14. ll. 10-21; p. 20, ll. 5-13)

40. Mrs. Woods then discovered that the salaries for the Library Technician had been entered as "0" on the spreadsheets for most of the first year and all of the remaining years of the contract. (JE#4, Woods, Depo., p. 14, l. 21 to p. 15, l. 15)

41. Mrs. Woods immediately notified Pat Powell of the error and Pat Powell immediately called Rose Baker. (JE#4, p. 17, ll. 8-14)

42. Pat Powell testified that she immediately called Rosalind Baker and informed her of the error. She also testified that she discussed the matter with Ms. Baker several times and that at first Ms. Baker was receptive to changing the contract; however, later she became more negative. (JE#2, Powell Depo., p. 41, ll. 3-25)

43. Ms. Baker testified that the first time she was aware of the problem was when another government employee, Margaret Wages, notified her that the Plaintiff had called. During her testimony she did not mention any conversation with Patricia Powell. (JE#1, Baker Depo., p. 42, ll. 1-8)

44. The Plaintiff hired a person to fill the question position and paid them through the contract. (JE#2, Powell Deposition, p. 45, ll. 15-20)

## **THE LAW**

### **A. SUMMARY JUDGMENT STANDARD:**

Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (*Rule 56(c) of the Rules of the Unites States Court of Federal Claims; Bubble Room, Inc. v. United States, 159 F.3d 533, 561 (Fed Cir. 1998)* A material fact is one which will affect the outcome of the case. (*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 292, 106 S, Ct. 2505 (1986))* The moving party need only establish that there is an absence of evidence to support the nonmoving party's case. (*Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed 2d 265, 106 S. Ct. 2548 (1986)* To survive a motion of summary judgment, the

nonmoving party must provide evidence to show the existence of a genuine issue of material fact. (*R.J. Sanders, Inc. v. United States, 24 Ct.Cl. 288, 291 (1991)).* The same burden requirements apply to a cross-motion for summary judgment. *(Bubble Room, Inc., 159 F. 3d at 561)*

**B. REFORMATION OF A CONTRACT FOR A MISTAKE IN BID:**

"In order to merit application of the equitable remedy of contract reformation for a unilateral mistake, clear and convincing evidence must show, as appropriate, that : (1) the mistake in fact occurred prior to contract award; (2) the mistake was a clear-cut clerical or mathematical error or misreading of the specification and not a judgmental error; (3) prior to the award the Government knew or should have known that a mistake had been made; (4) the Government's request for bid verification was inadequate; and (5) proof of the intended proposal was established." *Appeal of The Kato Corporation, 97-2 BCA, p29,130 (1997); See also FAR 14.407-4.*

"A government contract may be reformed or rescinded if the contracting officer accepts a bid with actual or constructive knowledge that the bid contains an error. (*Dakota Tribal Industries v. United States, 34 Fed. Cl. 593 (1995); BCM Corp. v. United States, 2 Ct Cl. 602 (1983); Will H. Hall And Son, Inc. v. United States, 54 Fed. Cl. 436 (2002)).*

"Generally. a contractor may obtain reformation or rescission of the contract only if the contractor established that its bid error resulted from a 'clear cut clerical or arithmetical error, or a misreading of the specifications." (*Hall at 440; Geisler v. United States, 232 F. 3d 863, 869 (Fed. Cir 2000); Liebherr Crane Corp. v. United States, 810 F. 2d 1153, 1157 (Fed. Cir. 1987); C. W. Over & Sons, Inc. v. United States, 44 Fed. Cl.*

*18, 29 (1999))* "If the contractor's error does not constitute one of these kinds of mistakes, then the contractor is not eligible for reformation of the contract." *Geisler, 232 F. 2d at 869; see also Liebherr Crane Corp., 810 F. 2d at 1157; United States v. Hamilton, 711 F. 2d 1038, 1046 (Fed. Cir. 1983)*.

A bidder's request for an upward correction of its bid must be supported by clear and convincing evidence of both the existence of a mistake and the intended bid. (*48 C.F.R. §14.407-3(a)*) The intended bid does not need to be an exact figure, as long as the bidder provided clear and convincing evidence to establish that the bid would fall within a narrow range of uncertainty and would remain the low bid if corrected. (*Bromley Contracting v. United States, 219 Ct. Cl. 517, 596 F. 2d 448, 459 (Ct. Cl. 1979); Hall at 440*)) Clear and convincing evidence "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable." *Price v. Symsek 988 F. 2d 1187, 1191 (Fed. Cir. 1993); Hall at 442)*

"Even if the mistake were clerical or otherwise excusable, the equitable relief sought ...is available only where the contracting officer has reason to know that the bid is mistaken. A contracting officer has a duty to examine all bids for mistakes and "in cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bid, calling attention to the suspected mistake." *48 C.F.R. §14.406-1; BCM Corp., 2 Ct. Cl. at 609.* "The contracting officer has a duty to verify a

bid if all of the facts and circumstances suggest that it was reasonable to believe a mistake had been made."

As stated in *Geisler, 232 F. 3d at 872:*

> "It is undisputed that the government has a general duty to examine bids for mistakes. 48 C.F.R. §14.407-1. Under this duty, the government must examine bids for "obvious" clerical errors, see 48 C.F.R. §14.407-2, and must examine bids for other errors, such as discrepancies between the contractor's bid and the bids of other contractors or the government estimate, see 48 C.F.R. §14.407-3. as set forth in the Federal Acquisition Regulations ("FAR"), however, the government's duty to examine contractors' submissions for mistakes only pertains to errors contained in contractors' bids..."

However, the Courts have not always limited the government's duty to examine to merely reviewing the bid pricing or comparisons with other bids or the government estimate. In *Hamilton, 711 F. 2d at 1044-1045*, the Court of Appeals for the Federal Circuit allowed a reformation because the contracting officer had constructive knowledge of an error in the contractor's manhour calculations through review of the contractor's bid of the number of manhours the contractor intended to expend compared to the government estimate of manhours needed to perform the services. Even though the contractor had only bid Thirty percent (30%) of the government estimated manhours, the contracting officer did not request verification. The Court held that the contracting officer had not fulfilled his duty to confirm the adequacy of the contractor's bid. And in *Connelly Containers, Inc. v. United States, 7 Ct. Cl. 423*, the Court ruled that the contracting officer had not fulfilled his duty to verify the contractor's bid when a line by line review of the freight charges would have revealed that there were obvious discrepancies between plaintiff's bid prices for shipping the same item to several

different locations within the United States. The Court held that the contracting officer owed a duty to review the bid items line by line.

**DISCUSSION**

From the facts presented, it is obvious that an error was made in the Plaintiff's Best And Final Offer. (*PPFF ##27, 28 & 29)* It is also obvious that this was a clerical error and not an error of judgment. For some reason known only to Mr. Jim Covey, who because of his illness was unable to be deposed, the payroll amounts for the "Library Assistant/ Computer Oper III" at Malmstrom were not included in the computer spreadsheets. (*PPFF #29; Plaintiff's Exhibit #5)* As the bid amounts included in the Bid Schedule came from the totals from the spreadsheets, the error was passed on to the Bid Schedule and into Plaintiff's Best And Final Bid. (*PPFF #30, Plaintiff's Exhibit #4, pp. 6,7)* It is also obvious that this error in Plaintiff's Bid occurred prior to the award of the subject contract.

Plaintiff therefore contends that it has complied with the first two qualifications for establishing liability for a mistake in bid, i.e.: the error was clerical and occurred prior to the award of the contract. It is also contended that it has complied with the fifth requirement; that the correct bid be evident from a review of the bid or supporting documentation. In the instant case, the proper pricing for the "Library Assistant/Computer Oper III" was the price included in the initial price proposal. (*Plaintiff's Exhibit #1, pp. 30-36)* When the spreadsheet for the initial proposal is compared with the spreadsheet for the Best And Final Proposal, it is evident that the pricing for the first two months, the only months included in the Best And Final Pricing for this position, are the same. (*Compare pages 0030 through 0034 from Plaintiff's*

*Exhibit #1 to pages 001 through 005 of Plaintiff's Exhibit #5*) Therefore, it can be presumed that the blank monthly pricing would also be the same.

The difficulty with this case, as is in all of the cases concerning mistake in bid, is establishing that the government either knew or should have known that a mistake had been made in the bid and awarded the contract in spite of this fact. As there was no bid verification, proving whether or not the verification was adequate is unnecessary. If it can be established that the contracting officer either knew or should have known that there was a mistake in Plaintiff's bid, the fact that there was no verification requested makes it inadequate per se.

The question now becomes whether or not the contracting officer fulfilled her duty to review the Plaintiff's bid for mistakes. This determination is hampered by the fact that the contracting officer testified at her deposition that she could not specifically remember how she reviewed the Plaintiff's Best And Final offer. (*PPFF 22, 24)* She testified that she was only interested in the total price and was not interested in the prices for the individual Bases. (*PPFF 31, 32, 34)* She did not recall ever reviewing the Schedule for the individual Bases. She testified that she was not alerted by the approximately Two Hundred Thousand Dollar ($200,000) difference between the Plaintiff's Initial Proposal and Plaintiff's Best And Final Offer as it was only approximately a Two percent (2%) difference. (*PPFF 33*) It was her opinion that the bidders were to be creative in their final pricing and that this was merely the result of Plaintiff's creativity.

It is evident, however, that the contracting officer had actual knowledge of the difference between the Plaintiff's initial pricing for Malmstrom Air Force Base and the

incorrect Best And Final Offer pricing for the same installation. After receiving the Best And Final Offers from both offerors, the contracting officer prepared an Abstract of Bids. (*Plaintiff's Exhibit #6*) This was a detailed analysis of each offerors bid on a line item basis. It clearly shows that the contracting officer entered the amounts from the Plaintiff's Best And Final Offer in the Abstract. In addition, the contracting officer also drafted and sent a letter to the losing bidder informing it of the fact that the bid had been awarded to Plaintiff. (*Plaintiff's Exhibit #7*) This letter also contained a detailed listing of all of the line item prices from Plaintiff's Best And Final Pricing Proposal.

It is now established that the contracting officer was aware prior to the award of the contract of Plaintiff's pricing. The question now becomes whether or not the contracting officer, with knowledge of the pricing, should have realized that there was an error in the pricing and what should have alerted her to the error. Plaintiff's initial argument is that the contracting officer should have performed a line by line analysis of the final pricing. Apparently, according to her testimony, the contracting officer was the only individual privy to the pricing information. (*PPFF 15, 31)* She testified that she did the pricing analysis by herself and that the pricing information was not given to the technical team. Therefore, she, alone, had reviewed the initial pricing and was aware of the pricing for each of the two final competitors for each of the Air Force Bases.

While the contracting officer testified that this was an "all or none" award and that she was only interested in the total price, this assertion is not totally true. While the award was to be for all Air Force Bases as a total, each Base Library had to operate on its own. Therefore, the pricing structure for each Base had to stand on its own and be realistic. It is the contention of the Plaintiff that it was the contracting officer's duty to

review the pricing for each Base to determine that each Base could operate as planned, especially as the technical panel had scored the offerors on their manning levels and it was imperative for the offerors within the competitive range to maintain these manning levels.

Had the contracting officer done her duty and reviewed each Base's pricing, she would have realized that there was a considerable pricing difference in the Malmstrom bid schedule between the initial price proposal and the final price proposal. On a total basis, the final price for Malmstrom Air Force Base was Two Hundred and Twenty One Thousand, Seven Hundred and Fifty-two Dollars and Forty-three cents ($221,752.43) or Twenty-four and Ninety-two one-hundredths percent (24.92%) lower than the initial price. The contracting officer testified that she was only interested in the total price for all Bases together. The total price difference between the Plaintiff's initial total price and its final total was a reduction of Two Hundred and Thirty-two Thousand, Two Hundred and Seven Dollars and three cents ($232,207.03). Of this price reduction, Ninety-five and one-half percent (actually 95.497%) came from the Malmstrom mistake in bid.

The contracting officer testified that she thought that the price reduction came from the bidders' creativity. Had she done a proper analysis, she would have realized that almost all of the price reduction came from one Air Force Base and that this was not a reasonable pricing structure. This would have alerted any reasonable contracting officer to question why so much of the price reduction had come from just one pricing element and caused her to request a verification of the Plaintiff's bid, which would have alerted the Plaintiff to its error. This, alone, should provide substantial basis for the Plaintiff's requested reformation for a mistake-in-bid.

However, there is another analysis that further supports Plaintiff's claim. The sole purpose of this procurement was to furnish manning and support services for five separate Air Force Bases. The pricing structure was set by the bid schedule sent to the various bidders. On these forms, the Defendant had provided pricing for travel, training and library materials on a not-to-exceed basis. This was a set amount and was to be included in each bidders' pricing schedule. The entire remainder of the pricing was composed of salary and fringe benefits for the staffing at each base. A quick calculation indicates that approximately Eighty percent (80%) of the total pricing structure for the entire bid for each Air Force Base was composed of salary and benefits for the employees. Therefore, the manning proposed for each Air Force Base and the pricing therefore was the driving factor behind each offerors' bid.

According to the testimony of the contracting officer, and the file documentation, each offeror was to submit a technical proposal and a pricing proposal. The technical proposal was reviewed by a technical panel composed of librarians from around the Air Force. The price proposal was reviewed only by the contracting officer. The offerors also had to present an oral presentation to the technical team on how they chose to provide manning and services to the various libraries. Once the technical panel made their decisions, the field of competitors was narrowed to two offerors, including the Plaintiff. At that time, the staffing levels had been approved by the technical team and had been locked in place. Any alteration in the staffing after this could result in elimination.

The fact that the staffing levels had been set was emphasized by the contracting officer in her letter to the two selected competitors. She specifically warned the two

finalists not to alter their manning levels to achieve a lower price. As the staffing levels, or manning levels, of an individual base was the major pricing factor of any bid, the other being the amount set by the Defendant and not subject to change, any drastic change in the pricing structure for any individual base would indicate a change in the staffing level and a violation of the technical panels' approval and the contracting officer's direction.

As the contracting officer was the only individual to review both the initial proposal and the final pricing, she had a duty to compare the two to insure that the technical panel's determination and her directions were adhered to. Had she reviewed the final pricing for the individual Bases, she could not have helped but detect the very large price differential between the initial price for Malmstrom and the final pricing for that Base's staffing. There would be only two reasons for the drastic change in pricing: (1) a major change in staffing level, which would violate the terms of the technical panel's determinations and could serve to eliminate the offeror; or (2) a mistake in bid. Either of these should have aroused the contracting officer's attention and required a bid verification request. However, nothing was done.

As stated above, it is obvious that the contracting officer had the pricing data in front of her prior to the award of the contract as the "Abstract of Bids/Proposals" was prepared prior to the award of the contract. Even a cursory examination of the data and a quick comparison with the initial pricing to insure that the offeror was complying with the technical requirements set by the technical panel, and the contracting officer's letter, would have alerted any reasonable contracting officer that something was amiss. It appears that the contracting officer in this matter either did not perform even a cursory

examination of the data, or she just did not care. What review the contracting officer actually accomplished is somewhat clouded as her responses to most questions was that she could not recall what had happened.

In any event, it is the position of the Plaintiff that she did not comply with her requirement pursuant to FAR §14.407.1, and existing case law, to examine the bids for mistakes and to request a verification of an offerors bid if alerted to a possible mistake in bid. In this instance, the contracting officer should have known that there was a mistake in the bid as she had a duty to examine the bids and the defect would have been easy to spot. As the contracting officer did not comply with her duty, the Plaintiff contends it is entitled to a reformation of the contract and recovery of the amounts spent in staffing the Library Technician position at Malmstrom Air Force Base, together with legal fees and costs.

Submitted, this the 1st day of March, 2006

Respectfully Submitted;
J. HATCHER GRAHAM, P.C.

/s/
J. Hatcher Graham
Georgia Bar No. 304577

P.O. Box 7626
Warner Robins
Georgia 31095
(478) 953-5606